**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| CITY OF ATLANTA FIREFIGHTERS' PENSION FUND,<br><br>                      Plaintiff,<br><br>        v.<br><br>ARCONIC INC., KATHERINE H. RAMUNDO, AMY E. ALVING, ARTHUR D. COLLINS, JR., RAJIV L. GUPTA, DAVID P. HESS, KLAUS KLEINFELD, SEAN O. MAHONEY, E. STANLEY O'NEAL, JOHN C. PLANT, L. RAFAEL REIF, JULIE G. RICHARDSON, PATRICIA F. RUSSO, ULRICH R. SCHMIDT, and RATAN N. TATA,<br><br>                    Defendants. | Case No. _____<br><br>**COMPLAINT FOR VIOLATION OF THE SECURITES EXCHANGE ACT OF 1934** |

City of Atlanta Firefighters' Pension Fund ("Plaintiff" or "Atlanta Firefighters"), by and through its counsel, brings this action against Defendants Arconic Inc., Katherine H. Ramundo, Amy E. Alving, Arthur D. Collings, Jr., Rajiv L. Gupta, David P. Hess, Klaus Kleinfeld, Sean O. Mahoney, E. Stanley O'Neal, John C. Plant, L. Rafael Reif, Julie G. Richardson, Patricia F. Russo, Ulrich R. Schmidt, and Ratan N. Tata (collectively "Defendants").  Plaintiff makes the following allegations upon personal knowledge as to itself and on information and belief (including the investigation of counsel and a review of publicly available information) as to all other matters. Plaintiff's information and belief are based on, *inter alia*, the independent investigation of its undersigned counsel.  This investigation included, but was not limited to, a review and analysis of:  (i) public filings with the United States Securities and Exchange Commission ("SEC") made by and concerning Defendant Arconic, Inc. ("Arconic" or the "Company"); (ii) research reports by securities and financial analysts; (iii) publicly available presentations by and concerning Arconic; (iv) Arconic's press releases and media reports; and (v) other publicly available material and data identified herein.

## I.    INTRODUCTION

1.    Shareholders of public corporations have a fundamental right to cast a fully informed vote, free from coercion, on the election of their directors.  This right to vote, known as the "shareholder franchise," forms the basis for the legitimacy of the directors' managerial powers. The core justification for allowing corporate directors to make critical decisions with money belonging to shareholders is that the shareholders, through a fair election process, freely choose their directors.  Corporate directors are permitted to maintain their authority to manage the company only by persuading investors of the merits of their ideas.  Most critically, incumbent directors may not abuse their control over the corporation as a weapon to threaten, deceive or coerce shareholders into voting for them.

2.      This action arises because Arconic's board of directors (the "Board"), unwilling to face a *bona fide* disagreement with shareholders concerning the Company's strategic direction, caused the Company to publish false information in order to threaten, deceive and coerce Arconic's shareholders into voting for them.

3.      The Board is in the middle of a heated proxy fight with the Company's largest investor, Elliott Management Corporation ("Elliott"), over the appointment of four new directors. In a Form 8-K filed on April 12, 2017 (the "April 12 Form 8-K"), the Board falsely told shareholders that a successful vote to replace four of the incumbent directors with Elliott's nominees could constitute a "change in control" under the terms of a trust agreement relating to the Company's nonqualified deferred compensation and retirement plans (the "Trust Agreement"), and thereby trigger a ***$500 million*** payment to the plans.

4.      This disclosure is the very essence of "fake news."  There is no change in control under the Trust Agreement, and the Board knows it.  Moreover, the timing of the April 12 Form 8-K was designed to deceive and coerce Arconic shareholders into voting for incumbent directors for reasons that have nothing to do with the merits of the Board's (or Elliott's) respective arguments about the Company's strategy or future.  Rather, the Board is impermissibly fabricating the specter of a $500 million penalty to shareholders who vote for Elliott's candidates.  Such coercion is the antithesis of any democracy, and is even worse here, because the Board is creating a false threat of harm.

5.      Arconic is a global leader in lightweight metals engineering and manufacturing with its headquarters in New York, New York.  Arconic's products include aluminum, nickel and titanium, and are used in aerospace, automotive, commercial transportation, consumer electronics and industrial applications around the world.  Over the past years, Arconic's financial performance

and shareholder return have lagged far behind the performance and shareholder returns of its peers and the S&P 500.  For example, over the past three years, Arconic's shareholder return has underperformed the S&P 500 by 22%, the shareholder returns of Arconic's industrial proxy peers by 37%, and the shareholder returns of Arconic's aluminum peers by 48%.

6.      In November 2015, Elliott Management ("Elliott"), a large investor in Arconic that manages approximately $33 billion of capital for institutional and individual investors, began to engage with the Board to improve the Company's performance.  The Board was receptive to Elliott's ideas and, in February 2016, voluntarily expanded the number of board seats and elected three new directors per a mutual agreement with Elliott.  Since then, the Board has re-nominated two of those directors and emphasized that all three of the individuals that Elliott proposed are independent.  Indeed, each of these individuals publicly recommends that shareholders support the Board's strategy rather than Elliott's proposed strategy.

7.      Elliott announced in early 2017 that it would seek to replace a minority of the Board by running a consent solicitation against four incumbent members of the 13-member Board who were up for reelection at the next annual meeting.  Elliott filed its definitive proxy statements on March 16, 2017, Arconic filed its definitive proxy statement on April 13, 2017, and the annual meeting to count the votes has been scheduled for May 16, 2017.

8.      The proxy fight between the Board and Elliott continues to be intense.  On April 12, 2017 – approximately one month before the annual meeting – Arconic filed a Form 8-K stating that the Company had informed the trustee of the Trust Agreement of a potential change in control because Elliott was conducting a proxy contest, and that, if a change of control occurs, Arconic would be obligated to immediately pay out approximately $500 million.  The April 12 Form 8-K – designed to improperly influence the election by coercing shareholders into voting for incumbent

3

directors regardless of the merits of their election – was false and misleading.  Election of Elliott's four nominees to a 13-member Board cannot constitute a change in control.

9.      Courts have long recognized the central importance of the shareholder franchise, and the need for courts to protect shareholders from actions that corporate officers and directors take to curtail voting rights.  The Supreme Court of the United States has stressed that "fair corporate suffrage is an important right that should attach to every equity security bought on a public exchange."  *Mills v. Elec. Auto-Lite Co.*, 396 U.S. 375, 381 (1970) (quotation marks, citations, and alteration omitted).  Section 14(a) of the Exchange Act is "intended to promote the free exercise of the voting rights of stockholders by ensuring that proxies would be solicited with explanation to the stockholder of the real nature of the questions for which authority to cast his vote is sought."  *Id.*; *see also United Paperworkers Int'l Union v. Int'l Paper Co.*, 985 F.2d 1190, 1198 (2d Cir. 1992) (Section 14(a) and Rule 14a-9 were "promulgated . . . with the goal of preserving for all shareholders who are entitled to vote . . . the right to make decisions based on information that is not false or misleading").

10.      Any voluntary action by an incumbent board that would actually impose material losses on the company triggered strictly by the shareholders exercising their franchise rights to remove the incumbent directors raises grave concerns about the incumbent board's loyalty and legitimacy to remain in office.  *See San Antonio Fire & Police Pension Fund v. Amylin Pharms., Inc.*, 983 A.2d 304, 315 (Del. Ch. 2009) (explaining that corporate agreements  that trigger substantial payments on a change in control have "an eviscerating effect on the stockholder franchise [that] raise[s] grave concerns").  For the Board to mislead shareholders into believing such a threat exists when, in fact, it does not, is the epitome of bad-faith manipulation of the shareholder vote.

11.     With Arconic's largest investor running a proxy contest to replace four members of the Board, it is imperative that the shareholders' fundamental right to cast informed and uncoerced votes in the election be protected.  Defendants must be enjoined from enjoying the fruits of their false and misleading April 12 Form 8-K.  Specifically, no proxy cards or revocations of the alternative proxy cards obtained through Defendants' false and misleading proxy materials should be counted at the annual meeting.  Injunction papers will be filed promptly.

## II.     JURISDICTION AND VENUE

12.     The claims asserted herein arise under Sections 14(a) and 20(a) of the Exchange Act (15 U.S.C. §§ 78n(a), 78t(a)), and the rules and regulations promulgated thereunder, including Rule 14a-9 (17 C.F.R. 240.14a-9).  This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa); and 28 U.S.C. § 1331 and 1337.

13.     This Court also has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332, as the parties to the action are diverse, and the amount in controversy exceeds $75,000.

14.     Venue is proper in this District pursuant to Section 27 of the Exchange Act, and 28 U.S.C. § 1391(b).  Many of the acts and transactions giving rise to the violations of law complained of herein occurred in this District.  In addition, Arconic maintains and at all relevant times maintained its corporate headquarters and principal executive offices in this District.  Moreover, Defendants have received substantial compensation in this district by engaging in numerous activities and conducting business here, which had an effect in this District.  Further, Individual Defendants Ramundo, Kleinfeld, Mahoney, O'Neal, and Richardson reside in this District.

15.     Each Defendant has minimum contacts with this District because each has entered into contracts in the District, has frequently traveled to the District on Arconic business, or has

authorized acts and actions that have had a sufficient impact in the District or on Arconic's shareholders and investors residing here to justify the exercise of jurisdiction.

## III.   THE PARTIES

### A.   Plaintiff

16.   City of Atlanta Firefighters' Pension Fund is a defined benefit pension plan established by the Georgia legislature under Georgia law, and is a citizen of the State of Georgia. Atlanta Firefighters is a current shareholder of Arconic, owned Arconic shares while the events and transactions complained of herein transpired, including when Arconic filed the false and misleading Form 8-K on April 12, 2017, and will continue to own Arconic common stock throughout this litigation.

### B.   Defendants

17.   Defendant Arconic, Inc. was known as Alcoa Inc. ("Alcoa") until it spun off a subsidiary know called Alcoa Corporation and renamed itself Arconic, Inc. in November 2016.[1] The Company is primarily focused on lightweight metals and engineering, and manufactures products for use in, among others, the aerospace and automotive industries.   Arconic is a Pennsylvania corporation with its principal executive offices located at 390 Park Avenue, New York, New York, and trades under the ticker symbol "ARNC" on the New York Stock Exchange.

18.   Defendant Katherine H. Ramundo ("Ramundo") serves as the Executive Vice President, Chief Legal Officer, and Corporate Secretary of Arconic.   Ramundo is responsible for leading Arconic's legal team, including regarding corporate-governance and securities-related matters.   Ramundo also serves as a member of the Arconic Executive Council.   Ramundo signed the false and misleading April 12 Form 8-K.   Ramundo is a resident of New York.

---

[1] For ease of reference, unless otherwise specified, all allegations concerning the Company prior to the November 2016 spinoff are to "the Company" or "Arconic," rather than to "Alcoa."

19.     Defendant Amy E. Alving ("Alving") has served as an independent member of Arconic's Board since November 2016.  Alving serves as a member of the Company's Audit Committee, and as Chair of the Cybersecurity Advisory Subcommittee.  Alving is a resident of Virginia.

20.     Defendant Arthur D. Collins, Jr. ("Collins") has served as an independent member of Arconic's Board since April 2010.  Collins serves as Chair of the Company's Compensation and Benefits Committee.  Collins is a resident of Florida.

21.     Defendant Rajiv L. Gupta ("Gupta") has served as an independent member of Arconic's Board since November 2016.  Gupta serves on the Company's Compensation and Benefits Committee, Executive Committee, and Governance and Nominating Committee.  Gupta is a resident of Florida.

22.     Defendant David P. Hess ("Hess") has served as a member of Arconic's Board since March 2017.  Hess, who was not previously employed by Arconic, was named interim CEO of the Company on April 17, 2017, following Kleinfeld's departure.  Hess is a resident of Connecticut.

23.     Defendant Klaus Kleinfeld ("Kleinfeld") served as an Arconic director beginning in November 2003 and served in several management positions, including serving as CEO of Alcoa from 2008 through the spinoff in November 2016, when Kleinfeld remained at the Company to serve as Chairman and CEO of Arconic.  In an April 17, 2017 press release, Arconic announced that Kleinfeld, "by mutual agreement with the Arconic Board of Directors, . . . stepped down as Chair and Chief Executive Officer of Arconic and has resigned as a Board member."  Prior to his departure from the Company, Kleinfeld served as Chair of Arconic's Executive Committee and International Committee.  Kleinfeld is a resident of New York.

7

24.     Defendant Sean O. Mahoney ("Mahoney") has served as an independent member of Arconic's Board since February 2016.  Mahoney serves on the Company's Audit Committee and International Committee.  Mahoney is a resident of New York.

25.     Defendant E. Stanley O'Neal ("O'Neal") has served as an independent member of Arconic's Board since January 2008.   O'Neal serves on the Company's Audit Committee, Executive Committee, and Governance and Nominating Committee.  O'Neal is a resident of New York.

26.     Defendant John C. Plant ("Plant") has served as an independent member of Arconic's Board since February 2016.  Plant serves on the Company's Compensation and Benefits Committee.  Plant is a resident of Michigan.

27.     Defendant L. Rafael Reif ("Reif") has served as an independent member of Arconic's Board since March 2015.  Reif serves on the Company's International Committee.  Reif is a resident of Massachusetts.

28.     Defendant Julie G. Richardson ("Richardson") has served as an independent member of Arconic's Board since November 2016.  Richardson serves on the Company's Audit Committee.  Richardson is a resident of New York.

29.     Defendant Patricia F. Russo ("Russo") has served as an independent member of Arconic's Board since November 2008.  Russo took over as interim Board Chair on April 17, 2017, following Kleinfeld's departure from the Company.  In addition, Russo serves as Chair of the Company's Governance and Nominating Committee, and also serves on the Compensation and Benefits Committee.  Russo is a resident of Florida.

30.     Defendant Ulrich R. Schmidt ("Schmidt") has served as an independent member of Arconic's Board since February 2016.  Schmidt serves as the Chair of the Company's Audit

Committee, and as a member of the Executive Committee and Governance and Nominating Committee. Schmidt is a resident of Florida.

31.     Defendant Ratan N. Tata ("Tata") has served as an independent member of Arconic's Board since February 2007. Tata serves on the Company's International Committee. Tata is a resident of Nevada.

32.     The Defendants identified in ¶¶ 18-31 above are referenced to herein as the "Individual Defendants."

**C.     Relevant Non-Parties**

33.     Elliott Management Corporation is a New York City-based hedge fund management firm, which serves as the management affiliate of the Elliott Associates L.P. and Elliott International Limited funds. In November 2015, through a Schedule 13D filed with the SEC, Elliott disclosed that, as of November 20, 2015, it (including associated entities) beneficially owned shares constituting approximately 5.1% of the shares of Arconic common stock then outstanding, and further had economic exposure representing approximately 1.3% of the shares of Arconic common stock pursuant to derivative agreements. At the time of the November 2016 spinoff, Elliott disclosed its beneficial ownership of approximately 8.1% of the shares of Arconic common stock then outstanding, in addition to economic exposure representing approximately 0.9% of the shares of Arconic common stock pursuant to derivative agreements. As of February 24, 2017, Elliott's ownership stake had increased to approximately 11.7% of the Company's outstanding shares of common stock, in addition to economic exposure comparable to approximately 1.7% of shares of outstanding common stock pursuant to derivative agreements.

IV.    **FACTUAL BACKGROUND**

A.    **Arconic's Business and Board of Directors**

34.    Arconic is a global leader in lightweight metals engineering and manufacturing with its headquarters in New York, New York.  Arconic's products include aluminum, nickel and titanium, and are used in aerospace, automotive, commercial transportation, consumer electronics, and industrial applications around the world.  Until November 1, 2016, Arconic was part of Alcoa, Inc., one of the world's largest producers of aluminum.

35.    In September 2015, Alcoa announced its intention to separate into two companies: (1) an "Upstream" company – which would ultimately be known as Alcoa Corporation – to focus on, among other things, aluminum production and aluminum can packaging; and (2) a "Value–Add" company – which would come to be Arconic – to focus on supplying manufactured components to the aerospace and automotive industries.  Alcoa completed the separation of Arconic on November 1, 2016.

36.    Arconic's certificate of incorporation provides for a classified board of directors, with three classes of directors, each as nearly equal in number as possible and each serving three-year terms.  In any given year, only one class of directors (or approximately one-third of the Board) is up for reelection.  Staggered boards generally serve to protect directors and companies from hostile takeover attempts, as hostile bidders cannot replace a majority of a company's directors without winning proxy contests at shareholder meetings in successive years.

37.    At the time of the spinoff and at all times relevant for this action until the recent resignation of Defendant Kleinfeld, the Arconic Board had at least 13 members.  After the upcoming 2017 annual meeting, the Board will once again have 13 members.  Because seven

directors are required to obtain a majority of the Board, election of one class of directors cannot result in a change of a majority of the Board.

**B.     The Board Adds Three New Independent Directors**

38.     In November 2015, Elliott disclosed in a Schedule 13D that it had accumulated a substantial equity stake in Arconic, representing approximately 6.4% of the Company's outstanding shares of common stock.   Elliott raised concerns with Company management concerning the Company's underperformance relative to peers and the market, and offered to assist the Company in improving its performance.

39.     The Board evidently engaged with Elliott and saw some common ground.   On February 1, 2016, Arconic and Elliott entered into a letter agreement to increase the size of the board of directors to fifteen directors and to appoint three individuals proposed by Elliott – Ulrich Schmidt, Sean O. Mahoney and John C. Plant (the "2016 Directors") – to the newly created vacancies on the Arconic board.   The letter agreement made clear that these three new directors would remain on the Arconic Board following the separation from Alcoa.

40.     All of the 2016 Directors are experienced executives with backgrounds in the automotive and aerospace industries.   They were not employed by Elliott.   After they were appointed to the Board, each joined a different class of the classified Arconic Board, so that each would come up for reelection separately, with one on the ballot in each of the ensuing three years.

41.     The Company's announcement of the expansion of the Board and the appointment of the 2016 Directors made no mention of any threat by Elliott to launch a proxy solicitation.   To the contrary, all publicly available information suggests that the letter agreement and expansion of the Board were amicable and took place without the threat or creation of proxy-related hostilities. Rather, an investor shared ideas with the Board, and the Board responded amicably.

42.     For example, the February 1, 2016 press release announcing the letter agreement emphasized that the appointment of the 2016 Directors would "add valuable experience" and "further strengthen the Company."   The press release also quoted Defendant Kleinfeld – then Arconic's Chairman and Chief Executive Officer – welcoming these directors to the Board, stating:

> We are pleased to welcome Rick, John, and Sean to the [Arconic] Board. . . . As we prepare to separate into two strong companies, we have been actively working to ensure each has a world-class Board of Directors focused on creating shareholder value.  Each of our new directors is a high caliber executive with a proven track record of success, and each brings valuable skills highly relevant to the markets we serve, including aerospace and automotive.  We look forward to drawing on their expertise as we launch two independent companies positioned for success.

43.     Arconic and the Board have also repeatedly stated that these directors are independent, necessarily meaning they are independent of Elliott.   For example, the proxy materials soliciting shareholder support for the Board's director nominees at the 2016 annual meeting of Arconic shareholders, including Mahoney, stated that "the Board of Directors has determined that each nominee qualifies as an independent director under New York Stock Exchange corporate governance listing standards and the Company's Director Independence Standards."   The proxy materials soliciting shareholder support for the Board's director nominees at the 2017 annual meeting, including Schmidt, contains a similar quote.   Both the 2016 and the 2017 proxy materials described each of the 2016 Directors as independent.

C.    **The Board Attempts to Entrench Itself by Using Arconic Funds to Buy Votes**

44.     Arconic was underperforming before the spinoff and continued to underperform following the spinoff.  This prompted the members of the Board, including the 2016 Directors, to begin to take steps to entrench themselves in office.

45.     On August 18, 2016, Arconic entered into an agreement with Oak Hill Capital Partners ("Oak Hill") with terms that have never been fully disclosed to Arconic's shareholders, but were clearly intended to entrench the Board.  Two years earlier, on June 25, 2014, Arconic had bought one of Oak Hill's portfolio companies, called Firth Rixson, for $2.35 billion in cash, $500 million in Arconic stock, and up to an additional $150 million through a potential earn-out.  In announcing the acquisition, Arconic stated that it expected Firth Rixson's revenues to grow 60% over the following three years.  Since the acquisition, however, Firth Rixson's performance was abysmal, missing 2016 revenues and earnings targets by 40% to 60%, leading Arconic to believe that it had viable legal claims against Oak Hill for misrepresenting the true state of Firth Rixson when Oak Hill sold it.

46.     On August 18, 2016, with the Board apparently fearing a proxy contest due to the Company's poor performance, Arconic suddenly entered into an agreement providing that "as part of the resolution of a working capital adjustment in connection with Arconic's acquisition of Firth Hixson," Oak Hill agreed to vote its Arconic shares (approximately 2% of the outstanding shares) in support of directors nominated by the Board for a period of two years.  The reference to the "working capital adjustment" strongly suggests that in return for Oak Hill's support for the nominees presented by the Board, Arconic gave up all or part of its claims against Oak Hill in connection with the failed Firth Hixson acquisition.

47.     This agreement with Oak Hill was a wholly improper use of corporate assets.  Directors and officers are not permitted to use corporate funds to buy shareholder votes.  Moreover, Arconic did not disclose the agreement with Oak Hill until after the record date for the Company's 2017 annual meeting, preventing other shareholders from attempting to acquire Oak Hill's shares in order to neutralize the agreement's effect.  After Elliott strongly criticized the agreement, the

13

Company immediately announced that it was waiving the requirement that Oak Hill vote its shares as directed by the Board, tacitly admitting that there was no proper basis for the agreement to begin with, which constituted an exchange of company assets for votes to entrench the incumbent Board.

### D.     Elliott Launches a Proxy Fight To Unseat Incumbent Directors and Seeks to Replace Kleinfeld as Arconic's CEO

48.     On January 31, 2017, Elliott announced that it would engage in a consent solicitation by nominating five directors to serve on the Arconic Board, to be voted on at the Company's 2017 annual meeting of shareholders.  Elliott expressed its belief that "a change of leadership is required to improve performance at Arconic today," and provided biographies of its director nominees to replace incumbent directors up for reelection.  In a letter to shareholders the next day, February 1, 2017, Elliott wrote:

> Arconic operates a world-class collection of assets that, if managed properly, with prudent reinvestment of capital, should produce substantial returns for its shareholder owners.  However, current management's persistent failure at these tasks for nearly a decade has destroyed considerable shareholder value.  *We believe a change of leadership is required to improve performance at Arconic today.*
>
> As a result, we have identified and are submitting for election at the Company's 2017 Annual Meeting a slate of *independent, highly qualified nominees* (the "Shareholder Nominees") to join Arconic's board.  The Shareholder Nominees each bring substantial expertise and deep experience, and they were selected specifically for their ability to empower the current Board to act on the enormous value-creation opportunity present at Arconic today.

49.     Elliott also disclosed that it had retained Larry Lawson ("Lawson"), a former CEO of aerospace company Spirit AeroSystems, Inc., as a consultant, and that it believed Lawson should replace Defendant Kleinfeld as Arconic's CEO:

> In addition, we have engaged former Spirit AeroSystems, Inc. CEO Larry Lawson as a consultant and believe that Mr. Lawson has the ideal set of skills needed to lead a turnaround of Arconic's woefully underperforming business. . . .
>
> For more than a year, Elliott has engaged in private discussions with the Company regarding the numerous ways in which Arconic could effectively execute its business separation, improve operational performance, enhance investor

14

communications, and establish improved corporate governance practices. Our fervent hope was to avoid a public discussion. However, a discussion has become unavoidable, principally because **the Company believes its current Chairman and CEO, Klaus Kleinfeld, is the leader best suited to achieve the realization of Arconic's considerable underlying value.**

**We disagree. We believe fundamental change is needed**, and the election of the Shareholder Nominees to the Company's Board is necessary to catalyze such a change. Moreover, we believe that Mr. Lawson's track record of operational excellence, extensive experience, and successful record of driving change is perfectly suited to the current opportunity at Arconic, and that it will be brought to bear in ways that we believe will benefit all long-term stakeholders.

(Emphasis added.)

50.     On March 9, 2017, Elliott filed a definitive proxy and related consent solicitation materials, seeking the election of four new directors: Christopher Ayers, Elmer Doty, Bernd Kessler, and Patrice Merrin.

### E.     The Board Rejects Elliott's Consent Solicitation and Engages in a Proxy Fight

51.     The Company fought back against Elliott's consent solicitation to replace four members of the Board and its proposal to replace Defendant Kleinfeld with Lawson. Indeed, Arconic's Board, **including the three 2016 Directors placed on the Board in February 2016 following the letter agreement with Elliott**, unanimously supported the incumbent Board members and Kleinfeld. A January 31, 2017 press release issued by the Company in response to Elliott's intention to nominate directors highlighted that "[t]he Arconic Board of Directors is unanimous in its support of Mr. Kleinfeld as Chairman and Chief Executive Officer of the Company" and that, "[i]n addition to Mr. Kleinfeld, the Board consists of 12 directors, **all of whom are independent**," including the 2016 Directors. (Emphasis added.)

52.     In a February 6, 2017 letter to shareholders, the Board "reinforce[d] their **unanimous** support of the Company's strategic direction under the continued leadership of Chairman and CEO Klaus Kleinfeld." (Emphasis added.) The Board noted numerous "pressures

15

and risks" facing the Company throughout Kleinfeld's tenure at Alcoa and Arconic, including "severe liquidity concerns," yet expressed unanimous support for Kleinfeld to lead the Company moving forward.

53.     Elliott and the Board continued to publicly spar in the following weeks.  Among other things, on February 23, 2017, Elliott issued a letter to the Arconic Board arguing that Lawson should replace Kleinfeld as CEO.  Elliott wrote that since initially recommending Lawson, "Arconic's equity value has increased by more than 39%," evidencing that "Investors clearly want a change in leadership. . . . sooner rather than later."  Elliott also wrote that "Many other large shareholders have weighed in echoing our assessment.  By the rapid ascent of Arconic's share price, even those shareholders who have said nothing have sent a similar message.  If it wasn't clear enough, let us reiterate:  Do the right thing.  Change is needed."

54.     On March 2, 2017, the Arconic Board issued its Preliminary Proxy Statement to solicit support for its slate of incumbent directors, which the Board stated that it unanimously supports.  The Board's proxy materials also solicited votes in favor of various proposals, including certain amendments to the Company's articles of incorporation.

55.     The Board's slate of incumbent directors, which the Board unanimously supports, includes Defendant Schmidt, one of the three 2016 Directors added to the Board in February 2016 pursuant to the letter agreement with Elliott.

56.     In a letter to shareholders that day, the Board urged shareholders to reject Elliott's director nominees and instead defer to "the business judgment of its 12 independent directors – who have unanimously concluded that the best interests of Arconic and all Arconic shareholders are served by the continued leadership of Mr. Kleinfeld."  Arconic also announced the appointment

of Defendant Hess to replace Sir Martin Sorrell, who had served on the Board but decided not to stand for re-election.

57.     After the Board issued its preliminary proxy materials, Elliott continued to urge shareholders to reject the Board's recommendations and incumbent nominees.  In a statement to shareholders, Elliott stated:

> The Board's announcement today is disappointing.  More than a month after Elliott's public call for leadership change resulted in a more than 30% increase in the stock price and an outpouring of public support from fellow owners, the Board has proffered nothing more than a handful of inadequate and long-overdue corporate-governance half-measures*, taken only grudgingly and under the pressure of an ongoing proxy contest*.  If this is the Board's best response to shareholders' clear hopes and expectations for new leadership and accountability, then *there could be no better argument for the election of new independent directors with a mandate for change*.

(Emphasis added.)

58.     In numerous filings and public statements throughout March and April 2017, the Arconic Board and Elliott continued to argue to shareholders to vote for each side's respective director nominees.   Among other filings, Elliott filed definitive proxy materials soliciting shareholder votes on March 9, 2017, and the Board filed its definitive proxy materials on March 13, 2017.  The Board's filing included a notification to shareholders that the Company's annual meeting of shareholders is scheduled to be held on May 16, 2017, as well as a reinforcement of its unanimous support for the Board's nominees, including Schmidt.

59.     In short, until April 12, 2017, the tools of democracy were being used by both sides to win what it seemed like would be a fair election based on the merits of competing slates.

### F.     Arconic Files the False And Misleading April 12 Form 8-K Threatening Shareholders With Severe Financial Harm if they Vote for Elliott's Nominees

60.     On April 12, 2017, with the proxy contest between the Arconic Board and Elliott raging, Defendants took a drastic step to coerce Arconic's shareholders to support the incumbent

directors and reject Elliott's calls for change.  That day, Arconic filed the April 12 Form 8-K with the SEC, threatening shareholders that if they elected Elliott's four Board nominees to replace the incumbent directors, the Company could be obligated to make a ***$500 million*** payment under the Trust Agreement relating to the Company's nonqualified deferred compensation and retirement plans.

61.    The April 12 Form 8-K disclosed the existence of the Trust Agreement and stated that in the event of a "change in control," Arconic would be required to pay approximately $500 million into the trust to fund the estimated liabilities of the covered benefit and retirement plans. Specifically, the April 12 Form 8-K stated:

> The terms of the Trust Agreement, which is filed herewith as Exhibit 99.1, provide for funding of the trust by the Company ***in connection with a change in control*** (as defined in the Trust Agreement) under certain circumstances.  The estimated aggregate amount of the required funding based upon the liabilities of the related plans is approximately ***$500 million***. While the assets of the trust would remain Company assets, following a change in control they would be available solely for purposes of paying benefits under the plans, other than in the case of the Company's insolvency.

(Emphasis added.)

62.    The April 12 Form 8-K further informed shareholders that the Company had delivered notice to the plan trustee that a "potential change in control" had occurred because "Elliott Management Corporation is conducting a proxy solicitation to elect four new directors to replace four of the present directors of the Company."   According to the Form 8-K, "[n]o determination has been made at this time as to whether there will be a change in control."

63.    The April 12 Form 8-K was false and misleading.  Under the relevant provisions of the Trust Agreement, there cannot be any change in control just because Arconic's shareholders elect Elliott's nominees to the Board.  The threat of a potential $500 million funding obligation triggered by shareholders defying the wishes of the Board is false.

### 1.   There Will Be No Change in Control

64.     At the time of the April 12 Form 8-K, the Arconic Board had 13 members.  Because a majority of a 13-member Board is seven members, election of Elliott's four director nominees to the Board cannot constitute a change in control.

65.     The three 2016 Directors whom the Board appointed in February 2016 pursuant to the letter agreement with Elliott are admittedly independent and do not count toward determining whether the election of Elliott's proposed nominees constitutes a change in control.  As noted corporate governance expert and University of Delaware Professor Charles Elson observed on April 13, 2017 in connection with the proxy fight at Arconic, "directors, once installed, have a fiduciary duty to the whole company, not the activists that put them there.  Change in control has always been when one company takes over another . . . . Replacing directors isn't in my view change in control.  It is simply rather a change in oversight."  *Elliott to Shareholders: Ignore Arconic's $500M Poison Put*, The Deal (April 13, 2017).

66.     Here, the Board has repeatedly proclaimed that each of Schmidt, Mahoney, and Plant is independent, including in the January 31, 2017 press release in which the Board's members (including Schmidt, Mahoney, and Plant) unanimously expressed their support for Defendant Kleinfeld and opposed Elliott's proposal to install Lawson.  Indeed, in the Board's March 13, 2017 proxy materials, the Board **unanimously** recommended that shareholders vote for Schmidt as one of its nominees, making clear that the Board has determined that he is independent of Elliott.

### 2.   There Will Be No Change in Control under the Terms of the Trust Agreement

67.     Section 11.1 of the Trust Agreement, titled "Change in Control of the Company," sets forth six circumstances that constitute a change in control under the agreement, none of which would be triggered by Arconic's shareholders approving the nomination of Elliott's four nominees.

19

No shareholder, including Elliott, is the beneficial owner of 20% or more of Arconic's voting power (§ 11.1(a)), there is no pending strategic transaction, disposition of substantially all of Arconic's assets, or liquidation or dissolution of the Company (§§ 11.1(c), (d) and (e)), and, according to the April 12 Form 8-K, "[n]o determination has been made at this time as to whether there will be a change in control" (§ 11.1(f)).

68.     Section 11.1(b) of the Trust Agreement provides that under certain circumstances not applicable here, a change in control may occur if incumbent directors no longer constitute a majority of the Board.  Specifically, § 11.1(b) provides that a change in control occurs when the trustee receives notice from the Company's Board, CEO, or general counsel that:

> (b) individuals who, as of the date hereof, constitute the board of directors of the Company cease for any reason to constitute a majority of the board; provided however, that any individual becoming a director whose election, or nomination for election by the Company's shareholders, was approved by a vote of at least 75% of the directors then comprising the Incumbent Board, but excluding, for this purpose, any such individual whose initial assumption of office occurs as a result of an actual or threatened solicitation of proxies by or on behalf of an Entity other than the board of directors (the Incumbent Board);

69.     Here, at the time of the April 12 Form 8-K and the notice to the trustee, the Board comprised 13 directors, including five directors who were nominated for reelection by the Board.  Elliott nominated four directors, as shown below:

| Arconic Board, including Board Nominees | Elliott Nominees |
|---|---|
| Alving  (nominee) | Ayers |
| Hess (nominee) | Doty |
| Kleinfeld (nominee) | Kessler |
| Schmidt (nominee) | Merrin |
| Tata (nominee) | |
| Collins | |
| Gupta | |
| Mahoney | |

| Arconic Board, including Board Nominees | Elliott Nominees |
|---|---|
| O'Neal | |
| Plant | |
| Reif | |
| Richardson | |
| Russo | |

70.    Thus, regardless of the outcome of the election, the incumbent Board members would remain a majority of the Board.  As Elliott's proxy materials noted, "[w]e are seeking to change a minority of the Board."   The Board unanimously determined that all eight of the incumbent directors who were not up for reelection were independent, and unanimously determined that four out of the five up for reelection, with the exception of CEO Kleinfeld, were independent.

71.    The Board appointed two of the eight directors who were not up for reelection – Defendants Mahoney and Plant – to the Board pursuant to the 2016 letter agreement.  There is no indication in any public filing that the expansion of the Board to create three new seats and the appointment of Defendants Mahoney, Plant, and Schmidt to fill those seats was somehow the result of a threatened proxy contest or was supported by fewer than 75% of the directors.

72.    Even if in 2016 fewer than 75% of the incumbent Board members supported appointment of Defendants Mahoney, Plant, and Schmidt, there are still six incumbent directors in the 2017 election without any connection whatsoever to Elliott.  Moreover, at least one of the five Board nominees for the 2017 election would be reelected in any event, because Elliott has nominated only four directors, in an election with five open seats.  One of the Board's five nominees for the 2017 election, Defendant Schmidt, was also appointed to the Board pursuant to the 2016 letter agreement, but Arconic's public statements and proxy materials make clear that the Board ***unanimously*** nominated Schmidt for the 2017 annual election, thereby easily satisfying the

contractual provision in § 11.2(b) that any individual becoming a director with support of at least 75% of the directors will not be considered for purposes of determining whether there is a change in control under the contract.

73.     Moreover, there is no indication that any of the 2016 Directors were appointed as a result of an actual or threatened proxy solicitation.  To the contrary, as noted above, Arconic's public statements, including Arconic's Chairman and CEO, welcomed these Defendants to the Board.  None of Elliott's public statements or filings threatened a proxy solicitation in 2016. Therefore, all three ought to be considered incumbent directors under the terms of the Trust Agreement.  Thus, there can be no change in control if Elliott's four nominees are elected at the 2017 annual meeting.

74.     The April 12 Form 8-K is a false and misleading solicitation designed to improperly coerce shareholders into keeping the incumbent directors in office, based on the false threat that voting for the insurgents will trigger a $500 million payment out of the company.

### G.     Kleinfeld Threatens Elliott and Leaves the Company

75.     Elliott's proxy materials made clear that it intended to replace Defendant Kleinfeld as Arconic's Chairman and CEO.  In response, Defendant Kleinfeld reportedly took improper actions to intimidate Elliott, which ultimately backfired and led to Kleinfeld's resignation from the Company.   On April 17, 2017, Arconic announced that Defendant Kleinfeld, "by mutual agreement with the Arconic Board of Directors, has stepped down as Chair and Chief Executive Officer of Arconic and has resigned as a Board member."  Arconic further disclosed that "Mr. Kleinfeld stepped down as Chair and CEO by mutual agreement after the Board learned that, without consultation with or authorization by the Board, he had sent a letter directly to a senior officer of Elliott Management that the Board determined showed poor judgment."  Arconic

announced that Defendant Hess would replace Kleinfeld as CEO and that Defendant Russo would replace Kleinfeld as Board Chair, both on an interim basis.

76.     Kleinfeld's letter is not public.  In an April 17, 2017 press release, Elliott described the letter as "a threat to intimidate or extort a senior officer of Elliott Management based on completely false insinuations."  Elliott explained that Kleinfeld's letter was "a threat that we took seriously and about which we immediately and privately informed the Board."  Elliott continued, "This is highly inappropriate behavior by anyone and certainly by the CEO of a regulated, publicly traded company, in the midst of a proxy contest."

77.     Announcing Kleinfeld's departure, the Board made clear that it still supported the Company's strategic direction criticized by Elliott, and that Kleinfeld's departure should not be seen as a concession in the proxy fight.  As Arconic's announcement stated, "Importantly, this decision was not made in response to the proxy fight or Elliott Management's criticisms of the Company's strategy, leadership or performance . . . . The Board continues to believe that under Mr. Kleinfeld's leadership, the Company successfully executed a transformative vision . . . and the Board reaffirms the strategy developed under Mr. Kleinfeld's leadership and shared with our investors, customers, and employees."

78.     Elliott, in turn, made clear that it did not view Kleinfeld's departure as adequately addressing the concerns animating the proxy contest, and would continue to push for the election of its four nominees.  Noting that it viewed "[t]he long-overdue departure of Klaus Kleinfeld [a]s a necessary first step on the path to a new, stronger Arconic for shareholders and employees," Elliott stressed that, "[u]nfortunately, the Arconic Board appears determined to remain an obstacle to that worthy goal."  Elliott continued,

> [Kleinfeld's] letter cannot be viewed in isolation.  It is simply the latest debacle in
> a pattern of conduct in which the Board has repeatedly excused, endorsed, and

participated in Dr. Kleinfeld's poor leadership and attempts to entrench himself and his allies on the Board. **When such conduct manifests itself in a pattern as it has here, it is not a CEO problem. It is a Board problem.**

The Board now has the temerity to demand deference to its judgment in an attempt to further entrench the legacy directors, first and foremost Patricia Russo, whom the Board has appointed interim chair. But far from showing that the Board has learned from its profoundly mistaken support for Dr. Kleinfeld for so long, the Board's role in his departure now continues a troubling pattern of embracing change belatedly and reluctantly only at the point at which it becomes inevitable, and for the apparent principal purpose of promoting the Board's own entrenchment.

79.     Elliott concluded its April 17, 2017 statement by reiterating that it is proceeding with its proxy contest, and "intend[s]d to pursue our campaign for fundamental Board-level change as vigorously as ever."

## V.     MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS

80.     On April 12, 2017, Defendant Arconic issued the April 12 Form 8-K, signed by Defendant Ramundo.

81.     The April 12 Form 8-K stated that:

The terms of the Trust Agreement, which is filed herewith as Exhibit 99.1, provide for funding of the trust by the Company in connection with a "change in control" (as defined in the Trust Agreement) under certain circumstances. The estimated aggregate amount of the required funding based upon the liabilities of the related plans is approximately $500 million. While the assets of the trust would remain Company assets, following a change in control they would be available solely for purposes of paying benefits under the plans, other than in the case of the Company's insolvency.

On April 12, 2017, the Company delivered notice to the trustee that a potential change in control (as defined in the Trust Agreement) has occurred. As previously disclosed, Elliott Management Corporation is conducting a proxy solicitation to elect four new directors to replace four of the present directors of the Company. No determination has been made at this time as to whether there will be a change in control.

82.     A $500 million funding obligation would represent approximately 57% of the Company's cash from operations in 2016, 25% of its $1.9 billion in cash and cash equivalents as of December 31, 2016, and 5% of its $11 billion market capitalization, and is material to Arconic.

A $500 million payment obligation resulting from a successful proxy contest by Elliott would unquestionably be material to Plaintiff's decision with respect to its vote in the 2017 election.

83.    The April 12 Form 8-K was materially false and misleading, and omitted material facts necessary to render the statement not false and misleading.  The April 12 Form 8-K was materially false and misleading because it informed Arconic's shareholders that, if successful, Elliott's proxy solicitation could lead to a Change in Control under Section 11.1 of the Trust Agreement and a $500 million payment obligation by the Company.  As explained above, none of the conditions set forth in Sections 11.1(a)-(f) of the Trust Agreement had occurred or could occur as a result of the Board's proxy fight with Elliott.

84.    The April 12 Form 8-K was materially false and misleading because it stated that "[n]o determination has been made at this time as to whether there will be a change in control," thereby implying that a successful consent solicitation by Elliott could give cause for the Board to conclude that the election of Elliott's director nominees would constitute a change in control.  This is false.  The election of the Elliott nominees cannot change a majority of the board, and the Board is misleading investors to believe that voting their conscience may impose a heavy price tag.

85.    The April 12 Form 8-K was materially false and misleading because it omitted material information.  The April 12 Form 8-K did not inform shareholders of the basis for Arconic's determination that Elliott's consent solicitation represented a potential change in control that could lead to a $500 million payment obligation.  That information was material to Plaintiff, which was asked to cast its vote in a highly contentious proxy contest between competing candidates for the Board.  It is likely such information was omitted because there is no legitimate basis to contend a change in control is possible and the April 12 Form 8-K was intended to improperly influence the shareholder vote rather than reflect factual reality.

86.     The April 12 Form 8-K also did not inform Arconic shareholders whether the Board authorized the filing of the April 12 Form 8-K informing Arconic shareholders that Elliott's consent solicitation represented a potential change in control that could lead to a $500 million payment obligation.  This information was material to Plaintiff because it was asked to cast a vote in support of or against Board members who may or may not have been involved in threatening Plaintiff to support their reelection.

## VI.    CAUSES OF ACTION

### COUNT I

### FOR VIOLATION OF § 14(A) OF THE EXCHANGE ACT
#### (Against Arconic and Ramundo)

87.     Plaintiff repeats and realleges each and every allegation above as if set forth in full herein.  This claim sounds in negligence.  Defendants Arconic and Ramundo acted negligently in filing the April 12 Form 8K with false and misleading statements of material facts and/or omitting material facts required to be stated in order to make statements contained therein not misleading.

88.     In her capacity as Chief Legal Officer of Arconic, and as more fully described herein, Defendant Kleinfeld signed the false and misleading April 12 Form 8-K.

89.     By means of the April 12 Form 8-K, Defendant Arconic improperly sought to secure Plaintiff's vote in favor of the Incumbent Directors.

90.     Defendant Arconic allowed the April 12 Form 8-K to falsely represent, among other things, that a change in control could occur if shareholders elect Elliott's nominees at the 2017 annual meeting and that, as a result, Arconic may incur a $500 million payment obligation.

91.     Defendant Arconic also negligently in failing to update the April 12 Form 8-K, which was false at the time it was issued and was also rendered false and misleading by the omission of relevant information.

26

92.     Defendant Arconic was required to abstain from filing the false and misleading April 12 Form 8-K or at least to disclose the material facts discussed above because Arconic was required to ensure that the April 12 Form 8-K, including any supplement or subsequent April 12 Form 8-K or Proxy materials, fully and fairly disclosed all material facts to allow a reasonably prudent investor to make an informed voting decision.

93.     The false and misleading April 12 Form 8-K described herein and the filing thereof is an essential link in the Defendants' efforts to solicit proxies in the 2017 election of the Company's directors.

94.     As a result of the filing of the false and misleading April 12 Form 8-K, Plaintiff is being denied the right to cast an informed and uncoerced vote with respect to the competing nominees for the Arconic Board and is being harmed as a direct and proximate result of the false and misleading statements and omissions in the April 12 Form 8-K.

95.     This claim is brought within the applicable statute of limitations.

96.     By reasons of the foregoing, Defendant Arconic violated Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a), and Rule 14a-9 promulgated thereunder, 17 C.F.R. 240.14a-9.

## COUNT II

### FOR VIOLATION OF § 20(A) OF THE EXCHANGE ACT
### (Against The Individual Defendants)

97.     Plaintiff repeats and realleges each and every allegation above as if set forth in full herein.

98.     As Arconic's most senior executive officers and directors, each of the Individual Defendants was a controlling person of Arconic within the meaning of Section 20(a) of the Exchange Act.  By reasons of their positions of control and authority as officers and/or directors of Arconic, these Defendants had the power and authority to cause Arconic to engage in the

wrongful conduct complained of herein.  These Defendants were able to and did control, directly and indirectly, the content of the April 12 Form 8-K described herein made by Arconic, thereby causing the dissemination of false and misleading statements and omissions of material facts as alleged herein.

99.     As members of the Arconic Board, Defendants Alving, Collins, Gupta, Hess, Kleinfeld, Mahoney, O'Neal, Plant, Reif, Richardson, Russo, Schmidt, and Tata participated in Arconic Board meetings, authorized the Proxy, and solicited shareholder support for the incumbent directors against the nominees put forward by Elliot.  After Arconic filed the false and misleading April 12 Form 8-K, Defendants Alving, Collins, Gupta, Hess, Kleinfeld, Mahoney, O'Neal, Plant, Reif, Richardson, Russo, Schmidt, and Tata did not file a corrective disclosure to inform Arconic shareholders that here will be no change in control under the Trust Agreement if Elliott's four nominees are elected at the 2017 annual meeting, the basis of the Company's determination that a change in control was possible, and whether the Board authorized the filing of the April 12 Form 8-K.

100.     In their capacities as senior corporate officers and/or directors of Arconic, and as more fully described above, the Individual Defendants participated in the misstatements and omissions set forth above.  Indeed, these Defendants had access to information regarding the circumstances surrounding the nomination of Schmidt, Plant, and Mahoney to the Arconic Board in 2016 and the Trust Agreement, including the Change-in-Control provision.  As a result of the foregoing, the Individual Defendants, as a group and individually, were control persons within the meaning of Section 20(a) of the Exchange Act.

101.     In his capacity as Chief Executive Officer of Arconic, and as more fully described above, Defendant Kleinfeld participated in the misstatements and omissions set forth above.

Defendant Kleinfeld had access to information regarding the circumstances surrounding the nomination of Schmidt, Plant, and Mahoney to the Arconic Board in 2016 and the Trust Agreement, including the Change-in-Control provision.   Defendant Kleinfeld also oversaw Defendant Ramundo who, as the Company's Chief Legal Officer, reported to him and signed the false and misleading April 12 Form 8-K.  As a result of the foregoing, Defendant Kleinfeld was a control person within the mearing of Section 20(a) of the Exchange Act.

102.    As set forth above, Arconic violated Section 14(a) of the Exchange Act by its acts and omissions alleged in this Complaint.  By virtue of their positions as controlling persons of Arconic, and as a result of their aforementioned conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act, jointly and severally with, and to the same extent as Arconic is liable pursuant to Section 14(a) of the Exchange Act, to Plaintiff.  Defendant Kleinfeld, as Chief Executive Officer, is also liable pursuant to Section 20(a) of the Exchange Act, jointly and severally with, and to the same extent as, Defendant Ramundo is liable pursuant to Section 14(a) of the Exchange Act.  Moreover, as detailed above, as Arconic's executive officers and directors, each of the Individual Defendants is responsible for the material misstatements and omissions made by Arconic.

103.    Plaintiff is being denied the right to cast an informed and uncoerced vote with respect to the competing nominees for the Arconic Board and is being harmed as a direct and proximate result of the false and misleading statements and omissions in the April 12 Form 8-K.

104.    This claim is brought within the applicable statute of limitations.

105.    By reasons of the foregoing, these Defendants violated Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

## VII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment as follows:

29

A.      Declaring that the April 12 Form 8-K is false and misleading;

B.      Declaring that Defendants Arconic and Ramundo have violated Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a), and Rule 14a-9 promulgated thereunder, 17 C.F.R. 240.14a-9;

C.      Declaring that the Individual Defendants have violated Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a);

D.      Requiring Defendants to fully disclose all material information related to, among other things, the April 12 Form 8-K;

E.      Enjoining Defendants from voting any proxy cards that cast votes in favor of incumbent Board nominees and any proxy revocation cards that revoke votes in favor of Elliot nominees that Defendants have received or will receive following the publication of the false and misleading statements and omissions in the April 12 Form 8-K;

F.      Enjoining the Individual Defendants from taking any further actions to impede or interfere with Plaintiff's right to cast a fully informed and uncoerced vote in the election of the competing nominees for the Arconic Board;

G.      Awarding Plaintiff its reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

H.      Granting such other or further relief as the Court may deem just and proper.

DATED:  April 19, 2017       **BERNSTEIN LITOWITZ BERGER**
                                 **& GROSSMANN LLP**

                             <u>/s/Jeroen van Kwawegen</u>
                             Mark Lebovitch
                             Jeroen van Kwawegen
                             Adam D. Hollander
                             John Vielandi
                             1251 Avenue of the Americas
                             New York, New York 10020
                             Tel: (212) 554-1400
                             Fax: (212) 554-1444
                             markl@blbglaw.com
                             jeroen@blbglaw.com
                             adam.hollander@blbglaw.com
                             john.vielandi@blbglaw.com

                             *Counsel for Plaintiff Atlanta Firefighters' Pension*
                             *Fund*